**SO ORDERED: December 27, 2013.**



**James M. Carr**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| MMOJA AJABU, | ) Case No. 10-04809-JMC-7 |
| | ) |
| Debtor. | ) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |
| | ) |
| MMOJA AJABU, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adversary Proceeding No. 12-50102 |
| | ) |
| U.S. DEPARTMENT OF EDUCATION and | ) |
| EDUCATIONAL CREDIT MANAGEMENT | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on September 12, 2013.  Plaintiff

Mmoja Ajabu ("Ajabu") appeared *pro se*.  Defendant United States Department of Education

("DOE") appeared by counsel Jeffrey L. Hunter and Lindsay Dunn.  Defendant Educational

Credit Management Corporation ("ECMC") appeared by counsel Junis L. Baldon. This matter

was taken under advisement at the conclusion of the trial with the parties permitted to submit

post-trial briefing and/or proposed findings of fact and conclusions of law on or before October

15, 2013 (Docket No. 116), which date was extended to November 15, 2013 (Docket No. 133).

The Court, having reviewed the evidence presented at the trial, Defendant Educational Credit

Management Corporation's Post-Trial Brief filed on November 15, 2013 (Docket No. 134) (the

"ECMC Post-Trial Brief"), United States' Proposed Findings Of Fact And Conclusions Of Law

And Entry submitted via email on November 15, 2013 (the "DOE Post-Trial Brief"), and the

other matters of record in this adversary proceeding; having heard the presentations of Ajabu and

counsel at the trial; and being otherwise duly advised, now enters the following findings of fact

and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary

proceeding by Fed. R. Bankr. P. 7052.

## Procedural History

1.      On April 6, 2010 (the "Petition Date"), Ajabu filed a voluntary petition for relief

under chapter 13 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the

"Bankruptcy Code").  Bankruptcy Case Docket No. 1.  On May 31, 2010, Ajabu filed a notice

converting the bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  Bankruptcy

Case Docket No. 26.

2.      On September 20, 2010, Ajabu received a discharge, and the bankruptcy case was

closed.  Bankruptcy Case Docket Nos. 48 and 49.  On January 6, 2012, the case was reopened.

Bankruptcy Case Docket No. 58.  Ajabu was given 90 days to file an adversary proceeding with

regard to the discharge of his student loan debts.  Bankruptcy Case Docket No. 56.

3.      On March 30, 2012, Ajabu initiated this adversary proceeding against DOE, Sallie Mae and Indiana University, seeking a determination that his student loan debts should be discharged by reason of undue hardship pursuant to § 523(a)(8).[1]  Complaint To Discharge Student Loan Debt (Docket No. 1), ¶ 2.

4.      On May 18, 2012, ECMC was substituted as a party defendant for Sallie Mae. Docket No. 16.

5.      On August 1, 2012, a default judgment was entered against Indiana University, and Ajabu's student loan debts to Indiana University were determined to be dischargeable in his bankruptcy case.  Docket No. 37.

### Findings of Fact

*The Student Loans at Issue in this Adversary Proceeding*

1.      On July 21, 2000, Ajabu applied for federal student loans under the direct loan program, and he signed a master promissory note evidencing his obligation to repay loans disbursed from January 22, 2001 through September 15, 2003 (collectively, the "DOE Loans"). Testimony of Rubio Canlas ("Canlas") given at the trial ("Canlas Testimony"), 130:14-23;[2] Trial Ex. bb.  The federal government originated (provided the money for) and initially serviced the DOE Loans.  Canlas Testimony, 130:20-23.

2.      The originally established repayment period of the DOE Loans was ten years, which started at the conclusion of a six-month grace period following Ajabu's withdrawal from school.  Ajabu's date of withdrawal was May 7, 2004, so his initial payment would have been due November 7, 2004.  Ajabu did not elect to participate in an income-contingent or income-

---

[1]      Unless otherwise noted, all statutory references are to the Bankruptcy Code.

[2]      All Canlas Testimony references are to the trial transcript filed September 20, 2013 (Docket No. 124).  Any clerical errors in the transcript have been corrected through reference to the audio recording of the trial.

based repayment program that would have altered the originally established repayment period for the DOE Loans.  Canlas Testimony, 136:7-138:6.

3.      On August 25, 2005, Ajabu defaulted on the DOE Loans.  Canlas Testimony, 135:7-9; Trial Ex. bb.

4.      The balance of the DOE Loans as of August 27, 2013 was $85,827.49, consisting of $63,942.47 in principal, $21,848.37 in interest and $36.65 in fees, with interest continuing to accrue thereon at 2.35% for a daily rate of $4.11 through June 30, 2014, and thereafter at a rate established by the DOE pursuant to the Higher Education Act of 1965.  Canlas Testimony, 132:1-7; Trial Ex. bb.

5.      Ajabu agrees that he has a student loan obligation within the ambit of § 523(a)(8) that runs to DOE.  Testimony of Ajabu given at the trial ("Ajabu Testimony"), 19:13-20:1; 20:16-21; 20:25-21:16.[3]

6.      Prior to the Petition Date, Ajabu applied for student loans from the predecessor in interest to ECMC, and he signed promissory notes evidencing his obligation to repay such loans on or about 1/8/98 ($5,500), 5/17/98 ($5,000), 8/14/98 ($10,500) and 8/18/99 ($5,000) (collectively, the "ECMC Loans").  Trial Ex. B.

7.      ECMC contends the balance of the ECMC loans is $47,013.36, consisting of principal, capitalized interest, accumulated interest, fees and costs.  Trial transcript ("Transcript"), 20:2-15.[4]

---

[3]      All Ajabu Testimony references are to the trial transcript filed September 20, 2013 (Docket No. 124).  Any clerical errors in the transcript have been corrected through reference to the audio recording of the trial.

[4]      All Transcript references are to the trial transcript filed September 20, 2013 (Docket No. 124).  Any clerical errors in the transcript have been corrected through reference to the audio recording of the trial.

8.    Ajabu agrees that he has a student loan obligation within the ambit of § 523(a)(8) that runs to ECMC.  Ajabu Testimony, 19:13-20:1; 20:16-21.

*Ajabu's Personal Circumstances*

9.    Ajabu is a 64-year-old single man with no dependents.  Ajabu Testimony, 25:16-23; 54:21-22.

10.    As of the date of trial, Ajabu does not suffer from any physical or mental disability and knows of no physical disability that would prevent him from working.  Ajabu Testimony, 54:23-25; 55:11-13.  At the trial, Ajabu indicated that he was being examined at the VA Medical Center in Indianapolis for a condition of unknown nature and severity.  Ajabu Testimony, 55:2-8.

*Criminal History*

11.    Ajabu was convicted of possession of marijuana in the mid-late 1970s and was incarcerated.  Ajabu Testimony, 42:20-24; 44:22-45:5; 121:4-7.

12.    Ajabu was also convicted of assault.  Ajabu Testimony, 42:25-44:21.

*Educational Background*

13.    Ajabu graduated from Ben Davis High School in Indianapolis.  Ajabu Testimony, 31:25-32:1.

14.    Ajabu earned an associate's degree in electrical engineering technology in 1979 from Indiana University – Purdue University Indianapolis ("IUPUI"), which he financed with monies he received for serving in the United States military.  Ajabu Testimony, 56:7-17; Trial Ex. 2.  While in school, he was president of the Indianapolis chapter of the National Society of Black Engineers.  Ajabu Testimony, 120:1-4; Trial Ex. 2.

15.     Ajabu earned a bachelor's degree in organizational leadership and supervision in 1999, 2000 or 2001 from IUPUI, which he financed through loans and grants.  Ajabu Testimony, 56:18-57:4; Trial Ex. 2.  Though not specifically addressed at trial, when comparing the date of Ajabu's bachelor's degree with the dates of the DOE Loans and the ECMC Loans, the Court believes the ECMC Loans were used to finance such degree.

16.     Ajabu earned a master of divinity degree from the Interdenominational Theological Center in Atlanta, Georgia in 2004, which he financed through loans and grants. Ajabu Testimony, 57:5-13; Trial Ex. 2.  Ajabu was over 50 years old when he started this degree program.  Ajabu Testimony, 119:14-19.  Though not specifically addressed at trial, when comparing the date of Ajabu's master's degree with the dates of the DOE Loans and the ECMC Loans, the Court believes the DOE Loans were used to finance such degree.

*Work History*

17.     Ajabu is currently retired.  Ajabu Testimony, 55:14-15.

18.     Ajabu's current daily activities include reading, working on his incarcerated son's case, and working on other people's cases by helping them navigate the justice system and providing guidance.  Ajabu Testimony, 30:10-23; 55:16-19; 121:13-122:9.  Ajabu does not receive payment for such work.  Ajabu Testimony, 55:20-24.

19.     Ajabu held technical jobs at ITT Tech, PSI Energy, RCA Corporation and the United States Navy Weapons Support Center in the 1970s, 1980s and early 1990s.  Ajabu Testimony, 120:5-11; 120:21-121:3; Trial Ex. 2.  He also worked at International Energy Management as a manufacturing liaison in the 1970s.  Trial Ex. 2.

20.     Ajabu worked as a youth director for Light of the World Christian Church from 1994 to 1996.  Trial Ex. 2.  He worked for J.M. Bell & Associates Company, LLC as a trainer and director of marketing from 1996 to 2001.  Trial Ex. 2.

21.     Ajabu's first job after graduating from the Interdenominational Theological Center was pastoring a church in Athens, Georgia.  Ajabu Testimony, 63:11-13; Trial Ex. 2.  He worked as pastor of The Light and associate pastor at St. James United Methodist Church in Athens, Georgia.  Ajabu Testimony, 69:2-8; Trial Ex. 2.  He was paid $30,000/year in those positions.  Ajabu Testimony, 69:18-19.  At approximately the same time, he was employed by the Atlanta Enterprise Center as a case manager/employment specialist.  Trial Ex. 2.

22.     After a gap of approximately one year, Ajabu was employed by Light of the World Christian Church in Indianapolis as Director of Truancy & Mentoring for Project IMPACT.  Ajabu Testimony, 69:20-24; 70:3-4; Trial Ex. 2.  His salary was $30,000/year.  Ajabu Testimony, 70:10-11.

23.     The last time Ajabu had regular paid employment was 2008 at Light of the World Christian Church through Project Impact, though he continued to volunteer through 2010.  Ajabu Testimony, 45:6-10; 70:18-72:2; Trial Ex. 2.

24.     Ajabu served as minister of social concerns at Light of the World Christian Church from 2006 to 2010, which was an unpaid position.  Ajabu Testimony, 74:14-20; Trial Ex. 2.

25.     Ajabu was an unpaid talk show host from 2006 to 2010.  Ajabu Testimony, 74:21-75:1; Trial Ex. 2.

26.     Ajabu is currently a volunteer pastor at Autumn Park.  Ajabu Testimony, 123:1-2; Trial Ex. 2.

27.     Ajabu considers himself a "highly public" figure and prominent in the community and on the internet, with YouTube clips, a Twitter feed and a Facebook page.  Ajabu Testimony, 117:19-119:6.

28.     Ajabu has a wide range of skills.  Ajabu Testimony, 123:3-5.

*Current Income and Expenses*

29.     Ajabu's current regular monthly income is $892, for an annual income of $10,704, consisting exclusively of social security benefits.  Ajabu Testimony, 26:2-10; 72:8-12. Ajabu started receiving social security benefits in 2011 at age 62.  Ajabu Testimony, 26:11-17.

30.     Since beginning to receive social security benefits, Ajabu has occasionally received incidental income from research work done with IUPUI, speaking fees of $50-$100/engagement and lawn mowing at $20-35/lawn.  Ajabu Testimony, 27:1-17; 72:13-73:10.

31.     Ajabu lives in a house he purchased in approximately 1979 when he was married. Chase holds a mortgage on the home, the remaining balance of which is approximately $20,000. Ajabu pays the mortgage payment of almost $600 per month from his social security benefits. Ajabu Testimony, 27:24-29:4.

32.     Ajabu owns a 1992 Chrysler vehicle that was given to him around 2008.  Ajabu Testimony, 29:8-18.

33.     Utility expenses include $140 per month for gas and $90-100 per month for electricity.  Ajabu Testimony, 29:19-30:3.

34.     Ajabu spends $50-75 per month for food.  Ajabu Testimony, 30:4-7.

35.     On occasion, Ajabu must choose which bills to pay because he does not have enough money to timely pay all that are due.  Ajabu Testimony, 80:2-4 ("I let bills go in order to be able to pay bills").

*Attempts to Find Employment*

36.     Ajabu does not know how many employment applications he has submitted for positions for which he was qualified or more than qualified.  Ajabu Testimony, 31:12-22; 73:11-14.  He applied to Indianapolis Public Schools to become coordinator of Project Last Chance (Trial Ex. 2; Ajabu Testimony, 32:7-24; 73:11-16); Tindley Schools (Trial Ex. 5; Ajabu Testimony, 33:5-17; 73:11-18); and the Metropolitan School District of Pike Township (Trial Ex. 6, Ajabu Testimony 33:18-34:1; 73:11-16).  The applications to Tindley Schools and the Metropolitan School District of Pike Township were made in December 2012.  Trial Ex. 5, 6.  Ajabu was not hired by any of those three entities.  Ajabu Testimony, 34:2-4.

37.     Ajabu applied to work at churches in Georgia and Indiana and at IUPUI.  Ajabu Testimony, 45:23-46:3; 73:11-12, 19; 73:24-74:1.

38.     Ajabu decided to go back to school to redefine himself and become a teacher so he could increase his income.  Ajabu Testimony, 31:23-25; 34:4-9.  He applied to IUPUI's transition to teach, or T2T, program and was conditionally admitted for 2010-11.  Trial Ex. 7; Ajabu Testimony, 34:10-23.

39.     At some point between May 21, 2010 (the date of the conditional acceptance letter) and June 24, 2010, Ajabu was denied admission to the T2T program based on his past criminal conviction(s), and he requested that such decision be overturned.  The School of Education Appeals Committee denied that request.  Trial Ex. 8; Ajabu Testimony, 35:7-37:22.

40.     At some point between June 24, 2010 and June 29, 2010, Ajabu appealed the decision of the School of Education Appeals Committee to Dr. Pat Rogan.  Dr. Rogan upheld the decision of that committee.  Trial Ex. 9; Ajabu Testimony, 37:23-39:2.

41.    In 2013, Ajabu thought about reapplying to the T2T program and contacted Dr. Rogan to determine whether his criminal background would again prevent his admittance into the T2T program.  Dr. Rogan replied that the relevant policies and procedures had not changed. Trial Ex. 4; Ajabu Testimony, 39:3-41:22.  Dr. Rogan stated that "since 2010, … schools throughout Indiana have become far more focused on the criminal history information of students that are proposed to be placed for field placement and student teaching experiences." Trial Ex. 4.

42.    Ajabu ran for Congress in 2012.  Ajabu Testimony, 118:13-16.

*Attempts to Repay Loans*

43.    Ajabu testified that he applied for a loan cancellation program based on information he received in 2004 or 2005 from IUPUI (the "Loan Cancellation Program") while he was living in Athens, Georgia.  Ajabu believes he qualified for the Loan Cancellation Program based on the work he did with children in Athens and Indianapolis.  Trial Ex. 1; Ajabu Testimony, 46:9-49:22; 51:5-52:2.

44.    Ajabu testified that he was accepted into the Loan Cancellation Program.  Ajabu did not offer any documentary evidence of same.  Ajabu Testimony, 49:23-50:9; 97:11-21; 97:22-99:6.

45.    Ajabu testified that he had taken part in the Loan Cancellation Program and thought his student loans were forgiven.  Ajabu Testimony, 93:13-21; 97:3-10.

46.    The Loan Cancellation Program was not applicable to the DOE Loans because they are part of the direct loan program, not Perkins loans originated by the schools.  Canlas Testimony, 131:6-25.

47.     As to the DOE Loans, Ajabu made no voluntary payments.  Involuntary payments made include wage garnishments on March 6, 2009 and May 12, 2009 and Treasury offsets. Canlas Testimony, 132:10-15; 134:25-135:6.

48.     Because Ajabu's DOE Loans are in default and/or because Ajabu made no voluntary payments on the DOE Loans, loan forgiveness programs for the DOE Loans (as direct student loans) are not available.  Canlas Testimony, 135:10-136:2.

49.     The federal government contends that it can offset Ajabu's social security benefits against the DOE Loans to the approximate extent of 15% of the social security benefits.  Canlas Testimony, 146:8-147:3.  An appeal with regard to the offset is available prior to the offset occurring.  Canlas Testimony, 147:19-148:13.

50.     In response to questioning by ECMC's counsel, Ajabu testified that he did not know when he made his last student loan payment (Ajabu Testimony, 90:19-21) or whether his wages were garnished for non-payment of student loans (Ajabu Testimony, 92:24-93:7), but he was certain that his tax refunds had been seized.  Ajabu Testimony, 93:8-10.  In response to interrogatories propounded during discovery, Ajabu asserted that he made interest-only payments on the ECMC Loans from the time Project Impact went out of business due to a lack of funding in 2008 until he filed his bankruptcy case in 2010.  Trial Ex. A, ¶ 12, p. 6.

51.     Ajabu did not apply for the William D. Ford Program (the "Ford Program"), even though his payment may have been $0/month, because he would continue to be obligated on the entire amount of the student loan debt.  Ajabu Testimony, 109:14-112:22.

*General Findings*

52.     The Court finds that Ajabu's income is likely to remain unchanged for the foreseeable future.   He has not had regular, paid employment for the last five years, and he has

not earned more than $30,000/year since graduating with the degrees financed by the DOE

Loans and the ECMC Loans.  While evidence was presented regarding Ajabu's wide range of

skills and abilities, there is no reasonable expectation that he can use them in 2014 and beyond to

generate additional income in an amount substantial enough to pay his student loans.  Ajabu

presented evidence that at least one avenue was closed to him in 2010 based on his criminal

history, which was reconfirmed in 2013.  With the increase in reliance on such searches by

employers, churches and schools, it is likely that his inability to obtain steady employment will

persist indefinitely.  His technical education and experience occurred between 1973 and 1994,

and it is likely that, for Ajabu to be competitive in 2014 and beyond, he would have to receive

additional technical training for which he does not have funds.

      53.     The Court finds that Ajabu does not currently incur extravagant or unreasonable

expenses.  He is not able to pay all of his expenses when they are due.  No evidence was

presented that Ajabu incurred extravagant or unreasonable expenses at any point during the

portion of the repayment period when he was employed as a pastor, by Project Impact, or

otherwise.  Ajabu's expenses are likely to increase in the coming months and years as a natural

result of aging.

      54.     Ajabu's financial situation is not likely to improve in the foreseeable future.

## Conclusions of Law

      1.     This Court has jurisdiction over the parties and the subject matter pursuant to 28

U.S.C. §§ 157(b) and 1334 and the General Order of Reference issued by the United States

District Court for the Southern District of Indiana on July 11, 1984.

      2.     Venue of this adversary proceeding is proper in this Court and Division pursuant

to 28 U.S.C. § 1409(a).

3.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4.      The dischargeability of student loans is governed by § 523(a)(8), which states:

(a)      A discharge under section 727 ... of this title does not discharge an
individual debtor from any debt –
　　　　(8)      unless excepting such debt from discharge under this paragraph
　　　　would impose an undue hardship on the debtor and the debtor's
　　　　dependents, for –
　　　　　　　(A)(i)   an educational benefit overpayment or loan made, insured
　　　　　　　or guaranteed by a governmental unit, or made under any program
　　　　　　　funded in whole or in part by a governmental unit or nonprofit
　　　　　　　institution; or …
　　　　　　　(B)      any other educational loan that is a qualified education
　　　　　　　loan, as defined in section 221(d)(1) of the Internal Revenue Code
　　　　　　　of 1986, incurred by a debtor who is an individual; ….

5.      At the beginning of the trial, Ajabu conceded that the DOE Loans and the ECMC

Loans are student loans within the ambit of § 523(a)(8).  See Findings of Fact, ¶¶ 5, 8.  Thus, the

Court will focus on the issue of whether excepting the DOE Loans and ECMC Loans from

discharge would impose an undue hardship on Ajabu.

6.      In Matter of Roberson, 999 F.2d 1132, 1135 (7th Cir. 1993), the Seventh Circuit

Court of Appeals adopted the three-prong test for undue hardship articulated by the Second

Circuit Court of Appeals in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d

395, 396 (2d Cir. 1987) (per curiam), as follows:

(1)      that the debtor cannot maintain, based on current income and expenses, a
　　　　"minimal" standard of living for [him]self and [his] dependents if forced
　　　　to repay the loans;
(2)      that additional circumstances exist indicating that this state of affairs is
　　　　likely to persist for a significant portion of the repayment period of the
　　　　student loans; and
(3)      that the debtor has made good faith efforts to repay the loans.

7.      Ajabu, as debtor, "has the burden of establishing each element of the test by a

preponderance of the evidence."  Goulet v. Educ. Credit Mgmt. Corp., 284 F.3d 773, 777 (7th

Cir. 2002) (citing Grogan v. Garner, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

*First Prong – Minimal Standard of Living*

8.    Whether Ajabu can maintain a minimal standard of living "should serve as the starting point for the … inquiry since information regarding the debtor's current financial situation generally will be concrete and readily obtainable; only if [Ajabu] meets this test should a court examine the other two *Brunner* requirements." Roberson, 999 F.2d at 1135.

9.    Ajabu asserts that he meets the first prong of the Brunner test because his income falls below the federal poverty guidelines. Ajabu Testimony, 24:7-26:6. ECMC does not contest that Ajabu meets the first prong.[5]

10.    The Court takes judicial notice of the 2013 federal poverty guideline of $11,490 for a one-person household. http://aspe.hhs.gov/poverty/13poverty.cfm (last visited December 27, 2013), which is higher than Ajabu's annualized social security benefits of $10,704. The Court cannot determine precisely whether Ajabu's income exceeds that guideline when adding in his occasional incidental income. However, it is not necessary to do so because "the test does not require a debtor to demonstrate that repayment of the loan would cause [him] to live at or below poverty level." In re Shirzadi, 269 B.R. 664, 668 (Bankr. S.D. Ind. 2001) (citing Lebovits v. Chase Manhattan Bank (In re Lebovits), 223 B.R. 265, 271 (Bankr. E.D.N.Y. 1998)). It is safe to say that Ajabu currently lives close to the poverty line and will likely continue to live close to the poverty line.

11.    Based on the evidence presented at trial, Ajabu has monthly expenses of $880-915 for his mortgage, gas bill, electric bill, and food expenses.

---

[5]    "Based on the evidence and testimony provided at trial, Ajabu most likely satisfies the first prong of the *Brunner* test. Although there are some discrepancies concerning Ajabu's assets, ECMC does not contest that based on his current reliance on monthly Social Security payments of $892.00 and expenses, Ajabu is unlikely to currently maintain a 'minimal' standard of living for himself under *Brunner*, particularly because *currently* Ajabu's loans are all fully due and payable." ECMC Post-Trial Brief, p. 7.

12. The Court takes judicial notice of (a) the Internal Revenue Service local standards for housing and utilities in Marion County, Indiana of $1,197 per month http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Indiana---Local-Standards:-Housing-and-Utilities (last visited December 27, 2013); and (b) the United States Trustee Program's housing and utilities standards for Marion County, Indiana of $783/month. http://www.justice.gov/ust/eo/bapcpa/20130501/bci_data/housing_charts/irs_housing_charts_IN.htm (last visited December 27, 2013). Ajabu's monthly mortgage and utility bills are $830-840, which fall between the two standards.

13. Ajabu's income is barely sufficient to pay his monthly expenses. There is no-to-little margin for transportation, medical bills or other reasonable non-recurring living expenses, not to mention funds to make monthly payments on the DOE Loans and the ECMC Loans. Ajabu would not be able to maintain a minimal standard of living if forced to repay the DOE Loans and the ECMC Loans.

14. Ajabu has satisfied the first prong of the Brunner test.

*Second Prong – State of Affairs is Likely to Persist*

15. Ajabu asserts that his status as a convicted felon meets the second prong of the Brunner test – that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans. Ajabu Testimony, 41:24-42:16.

16. " 'Requiring evidence not only of current inability to pay but also of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is "undue." ' " Roberson, 999 F.2d at 1136 (quoting Brunner, 831 F.2d at 396).

17.     Generally speaking, the second prong requires a court to make a prediction about the future based on the debtor's current circumstances to determine whether his/her inability to pay endures long enough ("a significant portion of the repayment period") such that the hardship debtor is presently experiencing ("this state of affairs") really is undue ("additional circumstances").

The Repayment Period

18.     ECMC acknowledged that the ECMC loans were made in 1998 and 1999, and there is a standard repayment period of ten years unless Ajabu applied for some other repayment program (which he did not).  Transcript, 52:10-18; 53:2-19.

19.     DOE acknowledged that the DOE loans were made between 2001 and 2004, and there is a standard repayment period of ten years after the six-month grace period expires, though extended repayment options are available.  Transcript, 52:10-14; 52:20-23; 53:2, 53:22-54:2.

20.     At trial, the Court asked the parties to make post-trial submissions addressing the issue of what the applicable repayment period is in a case such as this where the original 10-year repayment period for the ECMC Loans has concluded, and the same for the DOE Loans will end next year.  ECMC did not answer this question directly in the ECMC Post-Trial Brief, but the Court assumes it advocates a 25-year repayment period because of its focus on repayment plans under the Ford Program and In re Hollins, 286 B.R. 310 (Bankr. N.D. Tex. 2002).  ECMC Post-Trial Brief, pp. 11-15.  DOE also suggests a 25-year repayment period, noting that it "has the power to designate the loan as being an income-contingent repayment plan or an income-based repayment plan, effectively extending the loan repayment period to up to twenty-five years." DOE Post-Trial Brief, p. 9.

21.     The Hollins court grappled with how to apply the second prong when the loans

were past due and the entire repayment period had elapsed.  Id. at 314.  In that case, the court assessed the three administrative repayment schemes the debtor *would* be offered by the student loan creditor *before* it commenced collection actions and decided, in essence, that because a 25-year income-contingent payment plan was "available and practical", the debtor's current state of affairs would not likely persist.  Id. at 315-16.

22.     The Court does not find Hollins persuasive for three reasons:  (a) collection actions have already begun against Ajabu, at least by DOE; (b) the opinion focused solely on the "pros" of that option (e.g., the opportunity for the debtor to obtain a release at the end of the 25-year repayment period; her payment amount would be affordable; invoking the program would preclude collection actions) without balancing the concurrent "cons" she could experience (e.g., whether she would incur income tax liability at the end of the 25-year repayment period if the unpaid debt were forgiven or what the consequences would be in the event she defaulted under the repayment plan) (Hollins, 286 B.R. at 316); and (c) the numerous factual distinctions between Ms. Hollins and Ajabu:  Ms. Hollins had a proven earning capacity of $43,000/year while Ajabu has not made more than $30,000/year; Ms. Hollins was 42 years old and actively seeking more lucrative employment while Ajabu is 64 and retired, having not found full-time paid employment since 2008; Ms. Hollins anticipated being in the work force for 25 more years while the number of years Ajabu would be able to work in the future is uncertain.  See id.  at 313, 316.  There are simply too many factual differences between Ms. Hollins and Ajabu to find that what may have been "available and practical" for her is also "available and practical" for Ajabu.  In addition, there was too little evidence presented at trial regarding the details of repayment plans available to Ajabu such that the Court could meaningfully analyze whether one was "available and practical" for Ajabu.

23. The Court likewise does not find DOE's argument for a 25-year repayment period persuasive because given the option between collection actions and repayment period extensions, DOE has chosen collection as evidenced by its wage garnishments and tax refund intercept. The Court will not rely on what DOE has the unilateral power to do but has not done to extend the original ten-year repayment period to 25 years.

24. The Court understands DOE's argument that if the Court were to limit its analysis of the repayment period to the original ten-year period, the Court would be reading back into the Bankruptcy Code a discharge based on the age of the loan which Congress previously eliminated. DOE Post-Trial Brief, p. 9. The Court disagrees. Interpreting and applying one part of one prong of a judicially-established test does not read anything into the Bankruptcy Code where, as here, all three prongs of the test are designed to work together to measure "undue hardship." The Court does not believe that student loan creditors at risk of having the debt owed to them discharged as an undue hardship should be able to avail themselves of a longer repayment period for purposes of the second-prong analysis when in fact that longer period has not been effectuated. It is difficult to determine whether the undue hardship will persist for a significant part of ten years, let alone 25 years. Certainly, the student loan landscape has substantially changed since the <u>Brunner</u> opinion was issued in 1987, and it may be time to update the three-prong test accordingly. However, in any event, this Court does not believe that the <u>Brunner</u> court intended for the length of the repayment period to be a "moving target" at the discretion of the student loan lender and it will not impose same in this case.

25. Thus, the Court declines to adopt a 25-year repayment period in its analysis of the second prong absent an actual extension of the repayment period by (a) DOE or ECMC as authorized by the loan documents or applicable law, or (b) election by Ajabu. Instead, the Court

will focus on the stated amortization period of ten years established at the time the ECMC Loans and DOE Loans were made.

<u>Additional Circumstances</u>

26.     As the Court found in its analysis of the first prong, Ajabu's current state of affairs is bleak.  He barely makes enough income to pay his monthly expenses, let alone have money left over to pay other reasonable living expenses or his student loans.  As noted above, the Court finds that these circumstances have persisted since at least 2008 and will continue to persist into 2014.  <u>See</u> Findings of Fact, ¶¶ 23, 52, 54.

27.     Ajabu asserts that the circumstances will persist because he is a convicted felon. Ajabu Testimony, 41:24-42:16.  ECMC counters that Ajabu's criminal history cannot sustain a finding of additional circumstances; Ajabu has made a minimal employment search; and Ajabu qualifies for a $0.00 monthly payment on the ECMC Loans through the Ford Program.  ECMC Post-Trial Brief, pp. 7-15.  DOE argues that Ajabu's criminal history has not prevented him from getting jobs in the past; his age should not be a factor; he is tech-savvy and has a wide range of skills; he has no physical or mental disability; and he could seek employment in areas other than those to which he has limited his applications.  DOE Post-Trial Brief, pp. 6-7.

28.     Both ECMC and DOE rely on <u>Goulet</u>.  ECMC Post-Trial Brief, pp. 2, 8-9; DOE Post-Trial Brief, pp. 7, 10.  In that case, the Seventh Circuit found that the debtor's alcoholism and felony conviction for possession of cocaine with intent to deliver predated the loan, and it was "reluctant to label these pre-loan problems 'additional, exceptional circumstances' so as to constitute 'undue hardship' for purposes of Section 523(a)(8)."  <u>Goulet</u>, 284 F.3d at 779.

29.     The Court understands the logic of this argument.  However, Mr. Goulet was not convicted of a felony involving violence; Ajabu was incarcerated for a Class D felony and a

Class A misdemeanor involving violence.  Trial Ex. 9.  The <u>Goulet</u> opinion notes that there was

no evidence that Goulet's problems were insurmountable or impaired his ability to work.

<u>Goulet</u>, 284 F.3d at 779.  Ajabu has provided evidence that he was denied admission to IUPUI's

T2T program because of his convictions.  Trial Ex. 8, 9.  Employers, churches and schools rely

on criminal background checks now far more than in 2002, and conviction information is much

more readily available electronically today than it was then, so it is reasonable to conclude that

persons convicted of crimes involving violence will not have the same opportunities available to

them as non-felons.  Moreover, the Seventh Circuit did not establish a bright line – that

circumstances existing before the student loans are obtained will not constitute additional

circumstances.  Instead, it indicated a *reluctance* to labeling pre-loan problems as additional

circumstances.  <u>Goulet</u>, 284 F.3d at 779.  Under a different factual scenario, the Seventh Circuit

may very well have found that circumstances predating the student loans can constitute

additional circumstances, especially considering the different employment landscape that exists

today than did in 2002 and the state of the economy since 2008 when Ajabu held his last full-

time paying job.

      30.     Besides <u>Goulet</u>, ECMC's main argument rests in the alternative repayment plans

available through the Ford Program.  ECMC Post-Trial Brief, pp. 11-15.  For the reasons

discussed above, the Court does not find the basis for that argument persuasive under the facts of

this adversary proceeding.  <u>See</u> Conclusions of Law, ¶ 22.  DOE's arguments are based on the

notion that Ajabu should be able to get a job.  DOE Post-Trial Brief, pp. 6-7.  The Court agrees

that Ajabu seems to be a man capable of many things, but it is highly unlikely that he is

employable such that he can maintain a minimal standard of living and have money left over to

pay the ECMC Loans and the DOE Loans.

31.     The Court concludes that there are reliable indicators that Ajabu's hardship is undue and will exist throughout the remainder of the repayment period.  Ajabu has satisfied the second prong of the <u>Brunner</u> test.

*Third Prong – Good Faith*

32.     Ajabu believes he meets the third prong of the <u>Brunner</u> test – that the debtor has made good faith efforts to repay the loan – by applying for the Loan Cancellation Program based on his work in Athens and Indianapolis with children who satisfied the requirements of such program.  Ajabu Testimony, 46:9-14; 48:7-49:22; 50:16-52:6.

33.     ECMC and DOE argue that Ajabu presented no evidence of a good faith effort to repay because he has made no voluntary payments toward the student loans.  ECMC Post-Trial Brief, pp. 3, 15-16; DOE Post-Trial Brief, pp. 10-11

34.     As to the third prong, the Seventh Circuit has stated:  "With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses.  …  Furthermore, undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.' "  <u>Roberson</u>, 999 F.2d at 1136 (internal citations omitted).

35.     Good faith does *not* entail commitment to future efforts to repay – debtors do *not* always have to agree to a payment plan and forgo a discharge.  <u>Krieger v. Educ. Credit Mgmt. Corp. (In re Krieger)</u>, 713 F.3d 882, 884 (7th Cir. 2013).

36.     The arguments of ECMC and DOE boil down to this proposition:  Ajabu has not done enough – his job search was not extensive enough; he did not apply for enough jobs; he did

not apply for jobs in enough employment areas; he did not devote enough of the limited resources he had during the repayment period to paying off the ECMC Loans and/or DOE Loans; he did not make enough voluntary payments; he did not produce enough documentation to support his application to and acceptance into the Loan Cancellation Program.  However, under these facts, the Court does not see how 'more' effort to apply for 'more' jobs in 'more' employment areas is going to yield 'more' income sufficient to pay the ECMC Loans and/or the DOE Loans.

37.    Ajabu recognized his inability to pay and tried, although unsuccessfully, to have his student loans forgiven using information provided by the university at which he obtained one of the degrees financed through the student loans.  He tried to secure employment and re-educate himself to be a teacher so he could make more money, all to no avail.  His expenses cannot reasonably be further minimized.

38.    "[T]he dischargeability of student loans should be based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment."  Roberson, 999 F.2d at 1136 (quoting In re Briscoe, 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981)).  The Court finds a certainty of hopelessness in Ajabu's circumstances such that he cannot repay his student loans.

39.    Ajabu has satisfied the third prong of the Brunner test.

Accordingly, the Court concludes that the student loan debts owed by Ajabu to DOE and ECMC are DISCHARGEABLE.  The Court will enter judgment in favor of Ajabu and against DOE and ECMC.

# # #